IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 5:22-CV-425-FL

| | | |
|---|---|---|
| JA'LANA DUNLAP-BANKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CITY OF FAYETTEVILLE; RYAN HADDOCK; AMANDA BELL; JOHN AND JANE DOES 1 – 100; and DEANGELO ANDREWS | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court upon defendants' motion for summary judgment. (DE 39). The motion has been briefed fully, and the issues raised are ripe for ruling. For the following reasons, the motion is granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this civil rights action October 25, 2022, and filed her first amended complaint November 2, 2022, against defendants City of Fayetteville ("Fayetteville"), officer Ryan Haddock ("Haddock"), detective Amanda Bell ("Bell"), officer John Doe ("Doe"), and John and Jane Does 1-100. Defendants Haddock, Bell, and Doe (the "officer defendants") are employed by Fayetteville Police Department, and defendants John and Jane Does 1-100 are unnamed employees and officers of defendant Fayetteville. Plaintiff asserts claims against the officer defendants under 42 U.S.C. § 1983, for false arrest, excessive force, and retaliation for exercising freedom of speech. Plaintiff also brings a variety state law tort claims against the officer

defendants as well as a negligent hiring, training, and supervision claim against defendant Fayetteville. These claims arise from a single encounter between plaintiff and the officer defendants September 6, 2022. Plaintiff seeks compensatory, consequential, and punitive damages; injunctive and declaratory relief; costs; and attorneys' fees.

After an extension of time, defendants answered the first amended complaint, and discovery began pursuant to this court's March 9, 2023, case management order. On July 13, 2023, Plaintiff moved for leave to amend the complaint with no objection from defendants, and the court so allowed. Plaintiff then filed a second amended complaint August 3, 2023, substituting defendant John Doe with sergeant Deangelo Andrews ("Andrews"), also employed by Fayetteville Police Department.[1] Discovery continued, and the court granted two consent motions to extend discovery deadlines.

Defendants filed the instant motion April 22, 2024, relying upon a statement of material facts and appendix including: 1) affidavits of Douglas J. Hewett, defendant Fayetteville's city manager, and Fayetteville Police sergeant Christopher Kempf ("Kempf"), 2) statements by defendants Haddock and Bell, 3) deposition transcripts of defendant Haddock, defendant Bell, and plaintiff, 4) John J. Ryan's expert report, 5) photographs of plaintiff's hands, and 6) body-worn camera footage from defendants Haddock and Bell. After an extension of time, plaintiff responded, relying upon a response to defendants' statement of material facts and appendix including a map with blue ink markings and body-worn camera footage from defendant Andrews. Defendants replied.

---

[1] Where defendant John Doe was renamed DeAngelo Andrews in the second amended complaint (DE 28 at 1), the clerk is directed to update the docket to bring it in conformity with the caption of this order. Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

2

**STATEMENT OF UNDISPUTED FACTS**

On September 6, 2022, officers of the Fayetteville Police Department attempted to apprehend known gang member Joshua Tobias Page ("Page"), who had outstanding warrants for assault with a deadly weapon inflicting serious injury. (Defs' Statement Material Facts (DE 41) ("Defs' SMF") ¶ 1).[2] Based on surveillance, it was determined that Page was hiding at his mother's house located at 3477 Thorndike Drive, Fayetteville, North Carolina. (Id. ¶ 2). Upon arrival, officers identified Page, who fled on foot through the backyard and into the neighborhood. (Id. ¶ 3). Officers then canvassed the area in active search for the fugitive. (Id.). Plaintiff alleges the search was called off after 45 minutes. (Pl.'s Resp. Defs.' SMF & Add'l Statement Material Facts (DE 51) ("Pl.'s SMF") ¶ 6).

While canvassing in his patrol vehicle, defendant Haddock observed a blue Ford sedan driven by a female talking on a cell phone. (Defs.' SMF ¶ 4). Later identified as plaintiff, the driver drove onto the shoulder of Clearwater Drive, crossed a ditch, and continued onto an open field, stopping near a line of pine trees. (Id. ¶ 5). There was no driveway or other prepared path onto the field from Clearwater Drive. (Id.). The field is about one-half mile from the residence where Page fled, and defendant Haddock believed Page could have reached the field in the elapsed time. (Id. ¶ 6). Plaintiff notes, however, that any route along roads is longer than the direct distance between the two locations. (Pl.'s SMF ¶ 1).

Defendant Haddock found plaintiff's erratic driving unusual, given the proximity to Page's flight from police. (Id. ¶ 7). Believing plaintiff might be picking up Page, Haddock stopped his patrol vehicle in a wooded area on Clearwater Drive, out of plaintiff's sight. (Id. ¶ 8). Several

---

[2] Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in the parties' statements of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing statement."

minutes passed since Haddock first saw plaintiff.

Defendant Haddock donned his police vest, exited his patrol vehicle, and walked on Clearwater Drive toward the field, where he saw the car still parked near the tree line. (Id. ¶ 9). He approached on the right, engaged his body-worn camera, and observed plaintiff in the driver's seat of the running vehicle. (Id. ¶ 10).

Defendant Haddock believed plaintiff may have been in contact with the fugitive Page. (Id. ¶ 11). Haddock asked plaintiff why she was there, and she stated she was there for her boss who owned the property and was concerned about recent unauthorized dumping. (Id.). Plaintiff provided her boss's name when asked. (Id. ¶ 12). Haddock then asked if she was waiting for someone, and plaintiff's demeanor changed, heightening his suspicion. (Id. ¶ 12-13). Noticing her nervousness, Haddock requested her identification, but she stated she did not need to provide it. (Id.). Haddock then asked for plaintiff's boss's phone number, but she said he was a doctor in surgery and could not take a call. (Id. ¶ 14). When asked again for her identification, plaintiff admitted having it but refused to provide it. (Id. ¶ 15). Haddock explained a fugitive had fled nearby and he needed to verify her identity. (Id. ¶ 16).

Plaintiff continued to appear nervous, and defendant Haddock informed her she was not in trouble, but her location and behavior were suspicious. (Id. ¶ 17). He asked for her identification a third time, and she refused. (Id. ¶ 18). Plaintiff then attempted to reverse her vehicle, having never disengaging the engine. (Id.). According to plaintiff, defendant Haddock informed her that she was not free to go until she provided him with her name, which she did. (Pl.'s SMF ¶ 19).

Defendant Bell arrived as backup and ran the vehicle's license plate, finding it registered to Latonya Dunlap, born in 1971. (Defs.' SMF ¶ 20). Plaintiff told defendant Haddock her mother owned the car but still did not produce any identification. Defendant Bell asked if she should pull

4

plaintiff from the vehicle and defendant Haddock agreed. (Pl.'s SMF ¶ 21).

According to plaintiff, defendant Bell opened the driver's door and immediately grabbed plaintiff's arm to pull her out, and defendant Haddock then directed plaintiff to exit the vehicle. (Id. ¶ 22). Plaintiff refused, remained seated, and began recording the incident on her cell phone. (Defs.' SMF ¶ 23). Haddock opened the passenger door, unbuckled plaintiff's seatbelt, and disengaged the ignition. (Id.). When Bell alerted Haddock that a clear bag belted around plaintiff's waist contained her identification, plaintiff closed the bag and turned away, stating they "are not getting" her identification. (Id. ¶ 24).

Defendant Haddock walked around the rear of the car to the driver's side door and directed plaintiff to exit the vehicle. (Id. ¶ 25). Plaintiff then exited the vehicle on her own. (Id.). Defendant "Bell used a standard law enforcement hands on technique to gain control" of plaintiff, while Haddock handcuffed plaintiff. (Id. ¶¶ 26-27). According to plaintiff, she was not resisting or obstructing the officers' investigation, and Bell forcefully took plaintiff's phone and bag and threw the phone on the ground. (Pl.'s SMF ¶ 26). Bell retrieved plaintiff's identification and placed the bag and cell phone in the driver's seat. (Defs.' SMF ¶ 27). Plaintiff began to hyperventilate and vomit, and Haddock then walked her to the rear of the vehicle. (Pl.'s SMF ¶ 28). Defendant Andrews and Kempf arrived, explained to plaintiff the reason for her detention, and clarified plaintiff was not under arrest. (Defs.'s SMF ¶ 29). Plaintiff stated she wanted "that b****'s name." (Id.).

Meanwhile, defendant Bell confirmed plaintiff's identity and found no warrants. (Id. ¶ 30). The officer defendants determined that plaintiff was not connected to Page and removed her handcuffs. (Id. ¶ 31). Plaintiff had been handcuffed for approximately 15 minutes. (Pl.'s SMF ¶ 31). According to plaintiff, defendant Andrews kept plaintiff's motor vehicle keys while speaking

5

with other officers, which prevented her leaving. (Id.). Plaintiff alleges she was detained for a total of approximately 30 minutes. (Id.). Kempf provided plaintiff with the names and badge numbers of the officer defendants, advising plaintiff to file a complaint at the police station if she desired.

Plaintiff sustained minor cuts to her hands, which the officers photographed. (Id. ¶ 33). Plaintiff was not arrested but was issued a warning and released. (Id.). No weapons, batons, tasers, or pepper spray were used during the incident. (Id. ¶ 34). The officers used only "verbal commands and standard law enforcement techniques." (Id.). Body-worn cameras from defendants Haddock, Bell, and Andrews recorded the incident. (Pl.'s SMF ¶ 35).

## COURT'S DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).[3] Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is

---

3  Internal citations and quotation marks are omitted from citations unless otherwise specified.

"material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see Simmons v. Whitaker, 106 F.4th 379, 385 (4th Cir. 2024) ("[A]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party when there is a genuine dispute as to those facts." (emphasis omitted)).

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where a "verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

"[A]t the summary judgment stage, video evidence can only discredit a nonmovant's factual assertions if the video blatantly contradicts the nonmovant's position." Simmons, 106 F.4th at 385. "[W]hen a video quite clearly contradicts the version of the story told by the plaintiff so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Witt v. W. Va. State Police, Troop 2, 633

F.3d 272 (4th Cir. 2011).

B.   Analysis

Defendants move for summary judgment as to each of plaintiff's nine claims. The court first addresses plaintiff's federal claims under 42 U.S.C. § 1983 before discussing the state law claims.

1.   Federal Claims

"Section 1983 provides a cause of action against every person who, under color of any statute, ordinance, regulation, custom, or usage, of any [s]tate deprives someone of a federal constitutional or statutory right." Lindke v. Freed, 601 U.S. 187, 194 (2024) (emphasis omitted). The officer defendants assert the defense of qualified immunity as to each of plaintiff's three claims under § 1983. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, an official is entitled to qualified immunity when the plaintiff has not demonstrated a violation of a constitutional right or when the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "Absent clearly established law that proscribe[s] [an officer's] specific conduct, [the officer] should not be subjected to suit." Jackson v. Long, 102 F.3d 722, 731 (4th Cir. 1996).

a.   False Arrest and Unlawful Seizure and Arrest

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures by law enforcement officers. Graham v. Connor, 490 U.S. 386, 394-95 (1989). A seizure occurs when an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). An individual is

8

"seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980) (plurality opinion); United States v. Peters, 60 F.4th 855, 862 (4th Cir. 2023).

Seizures that are carried out without a warrant are per se unreasonable, subject to several established exceptions. Katz v. United States, 389 U.S. 347, 357 (1967). One of those exceptions is an investigatory detention on the reasonable suspicion of unlawful activity (hereinafter a "Terry stop"). Terry, 392 U.S. at 30. "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (quoting Terry, 392 U.S. at 27). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Id. at 123.

An officer can convert a previously voluntary encounter into a Terry stop by, among other things, informing an individual "that he [is] not free to leave until he identifie[s] himself." Wingate v. Fulford, 987 F.3d 299, 305 (4th Cir. 2021). However, Terry stops "must last no longer than necessary to verify or dispel the officer's suspicion." United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995). "When evaluating a Terry stop, [the court] must consider 1) whether the officer's actions were justified at their inception and 2) whether his subsequent actions were reasonably related in the scope of circumstances that justified the stop." United States v. Bernard, 927 F.3d 799, 805 (4th Cir. 2019).

Here, viewing the facts in the light most favorable to plaintiff, her interaction with the officer defendants became a Terry stop, and therefore a seizure under the Fourth Amendment, when defendant Haddock informed her that he "need[ed] to see [her] id" before he "would let [her]

get outta [t]here." (Def. Haddock Body-worn Camera Video & Audio ("Haddock BWC") (manually filed) 2:25-2:55). The court examines whether there was reasonable suspicion to initiate the Terry stop and whether the officer defendants' "subsequent actions were reasonably related in the scope of circumstances that justified the stop." Bernard, 927 F3.d at 805.

      i.  Reasonable Suspicion

Defendants acknowledge they did not have a warrant for plaintiff but contend that her eventual seizure was reasonable based on their suspicion that she was present in the field off Clearwater Drive to assist a violent fugitive's escape. Defendants cite the following factors to support their suspicion: 1) knowledge of a violent fugitive recently within a half-mile radius, 2) plaintiff driving across a ditch into an unpaved field, 3) plaintiff's multiple refusals to provide identification as requested, 4) plaintiff's nervous appearance and hard breathing upon questioning, and 5) plaintiff's attempt to place her car in reverse. (See Defs.' Mem. Supp. Mot. Summ. J. (DE 40) ("Defs.'Br. Supp.") at 16-17). Viewed collectively, these articulable and particularized facts provided reasonable suspicion to justify the officers briefly detaining plaintiff to investigate any potential connection to Page. The officer defendants' actions thus "were justified at their inception." Bernard, 927 F.3d at 805.

The facts of this case are distinguishable from those of Wingate, 987 F.3d 299, in which the court held that mere presence in a general high-crime area does not constitute reasonable suspicion. Id. at 311-12. Unlike in Wingate, the officers here were not relying on the general characteristics of the area to justify their actions. Instead, they were actively searching for a specific violent fugitive who had recently fled on foot. The officers' suspicion arose from the plaintiff's specific behavior and circumstances—driving into a field, refusing to provide identification, appearing nervous, and attempting to reverse her car—rather than from a

10

generalized association with a high-crime area. This focused context sets the case apart from the broad concerns addressed in Wingate.

                ii.        Reasonable Relation in Scope of Circumstances

Plaintiff argues that the investigatory stop became an arrest when defendants Haddock and Bell ordered her out of her vehicle and placed her in handcuffs, asserting that no probable cause supported such arrest. However, officers are permitted to use reasonable measures, including brief handcuffing, to ensure safety during a Terry stop. See Leshuk, 65 F.3d at 1109-10.

At the outset, the court notes that "[i]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." Hiibel v. Sixth Jud. Dist. Ct., 542 U.S. 177, 185 (2004). Therefore, defendant Haddock did not violate plaintiff's rights by asking for her identification. Additionally, "the inordinate risk that exists every time an officer approaches a person seated in an automobile justifies a per se rule that drivers may be ordered out of their vehicles during lawful traffic stops," even absent specific concerns about officer safety in a particular case. United States v. Stanfield, 109 F.3d 976, 980 (4th Cir. 1997). While this was not a traditional traffic stop, the inherent dangers of standing next to a running vehicle, compounded by plaintiff's attempt to shift the car into reverse, justified ordering her out of the vehicle. See id. Further, the use of handcuffs does not transform a Terry stop into an arrest when necessary for officer safety or to prevent flight. See Leshuk, 65 F.3d at 1109-10. Given the circumstances, including the ongoing search for a violent fugitive and plaintiff's refusal to provide her identification, the officers acted reasonably in handcuffing plaintiff while completing their investigation for a time "no longer than necessary to verify or dispel the officer's suspicion." Id. at 1109.

Plaintiff disputes the length of the seizure and presents evidence that, including the 15

11

minutes she was in handcuffs, she was seized for approximately 30 minutes. (Haddock BWC 0:00-15:00; Def. Andrews Body-worn Camera Video & Audio (manually filed) 8:00-18:49). The reasonableness of a detention's length depends on whether police "diligently pursued" their investigation without "unnecessarily prolong[ing]" the detention. United States v. Sharpe, 470 U.S. 675, 685 (1985). Plaintiff's sole claim of undue delay is that defendant Andrews "continued to hold onto [p]laintiff's vehicle keys while he proceeded to meet and confer with other officers, preventing [p]laintiff from leaving." (Pl.'s SMF (DE 51) ¶ 31). Even viewing this in the light most favorable to plaintiff, this delay was reasonable given the totality of the circumstances. Although a Terry "stop's primary mission is to verify or dispel an officer's suspicion, . . . [it] also includes ordinary inquiries incident to a stop, such as checking identification, determining whether there are outstanding warrants, and attending to related safety concerns." United States v. Brown, 114 F.4th 253 (4th Cir. 2024) (holding a 46-minute stop reasonable). Defendant Andrews's decision to hold plaintiff's keys while conversing with other officers for a few minutes after plaintiff's handcuffs were removed did not unnecessarily prolong the detention.

The officers had reasonable suspicion to detain plaintiff temporarily to investigate her potential association with Page. In addition and in the alternative, plaintiff's refusal to provide identification gave officers probable cause to arrest her under North Carolina law, which prohibits "willfully and unlawfully resist[ing], delay[ing], or obstruct[ing] a public officer in discharging or attempting to discharge an official duty." N.C. Gen. Stat. § 14-223; see Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (holding that probable cause for even minor offenses justifies arrest under the Fourth Amendment).

In sum, the officer defendants did not violate plaintiff's constitutional rights by asking for her identification, Hiibel, 542 U.S. at 185, ordering her out of her vehicle, Stanfield, 109 F.3d at

12

980, or handcuffing her long enough to confirm her identity and lack of connection to Page, Leshuk, 65 F.3d at 1109-10. Their actions did not unlawfully prolong the detention or exceed their investigatory purpose, and the officer defendants are therefore entitled to qualified immunity from plaintiff's claim of deprivation of civil rights by false arrest/unlawful seizure and arrest under 42 U.S.C. § 1983. Accordingly, defendants' motion for summary judgment is granted as to count one.

        b.      Excessive Force

Plaintiff argues in count two that the officer defendants' use of force against her was excessive. Defendants assert that plaintiff's excessive force claim must fail as a matter of law because the officers' use of force against plaintiff was objectively reasonable, entitling them to qualified immunity. Under the framework of qualified immunity, the court first determines whether the officer defendants' use of force violated plaintiff's constitutional rights. See Callahan, 555 U.S. 223, 232 (2009).

Claims of excessive force during an investigatory stop are governed by the Fourth Amendment and are analyzed under an "objective reasonableness" standard. Graham, 490 U.S. at 388; Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . to effect it," Graham, 490 U.S. at 396, but the relevant question is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force," Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396.

This court must balance plaintiff's individual Fourth Amendment rights "against the

13

countervailing governmental interests at stake." Graham, 490 U.S. at 396. The assessment is fact-dependent, including factors such as the severity of the alleged crime, the immediate threat posed to safety, and whether the individual was actively resisting or evading arrest. Id. The court may also consider "[t]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; [and] any effort made by the officer to temper or to limit the amount of force." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015).

Plaintiff disputes the facts surrounding the officers' use of force. Defendants assert that defendant Haddock decided to remove plaintiff from the vehicle due to her lack of cooperation and suspicious behavior, ultimately placing her in handcuffs for officer safety. (Defs.' SMF ¶¶ 21-22, 27). They further claim defendant Bell attempted to escort plaintiff from the vehicle. (Defs.' SMF ¶¶ 21-22). Plaintiff, however, contends that Bell immediately grabbed plaintiff's arm to forcibly remove her before Haddock directed plaintiff to exit the car. (Pl.'s SMF ¶¶ 21-22). While defendants allege plaintiff resisted after exiting the vehicle, she denies resistance and claims Bell forcefully threw her phone to the ground. (Id. ¶ 26). Plaintiff further argues that, as "a small, thin woman," she posed no threat to officer safety. (Id. ¶ 27). These disputes, however, must be evaluated from the perspective of a reasonable officer on the scene rather than through hindsight. Graham, 490 U.S. at 396; Anderson, 247 F.3d at 130. In this case, the officer defendants reasonably suspected plaintiff of attempting to assist a violent fugitive, a situation that justified heightened caution. (Defs.' SMF ¶¶ 7, 11, 12). Thus, even assuming the facts as plaintiff alleges, the severity of the alleged crime outweighs her small stature and lack of resistance.

The court also considers the proportionality of the force used in light of the circumstances. The plaintiff alleges she was pulled from her vehicle, slammed against it, and handcuffed, resulting in minor cuts to her hands, hyperventilation, and vomiting. The absence of substantial injury,

14

however, weighs in favor of reasonableness.  See Kingsley, 576 U.S. at 397.  Additionally, the officers' actions must be viewed in the context of their need to ensure safety during a potentially volatile encounter.  Graham, 490 U.S. at 396.

Plaintiff's reliance on Young v. Prince George's Cnty., 355 F.3d 751 (4th Cir. 2004), is inapposite.  In Young, the court held that an officer's decision to handcuff a potentially dangerous but cooperative suspect was reasonable.  Id. at 757.  The court held unreasonable the officer's subsequent decision to place the suspect in a headlock, throw him to the ground and repeatedly strike his head and back.  Id.  Here, the use of handcuffs was similarly a reasonable measure for officer safety, and plaintiff asserts no additional use of force after she was handcuffed.

In sum, the officer defendants' actions were objectively reasonable under the circumstances.  As such, the officer defendants are entitled to qualified immunity and to summary judgment as to count two – deprivation of civil rights by excessive force under 42 U.S.C. § 1983.

          c.      Interference and Retaliation Against Freedom of Speech

Plaintiff alleges that the officer defendants retaliated against her for using her cell phone to record a portion of their interaction.  To establish a First Amendment retaliation claim under § 1983, a plaintiff must prove: 1) engagement in a constitutionally protected First Amendment activity, 2) adverse action by the defendant against that protected activity, and 3) a causal connection between the protected activity and the defendant's conduct.  Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015).  Here, defendants dispute only the causation element, specifically whether plaintiff's act of recording caused the events which resulted in her phone being thrown to the ground.

Defendants argue that their decision to detain and remove plaintiff from the vehicle occurred before she began recording and that defendant Bell never took the phone from her.

15

(Defs.' Br. Supp. 26). Plaintiff contends, however, that her recording prompted defendant Bell to escalate the encounter and throw plaintiff's phone on the ground. (Pl.'s Resp. (DE 50) at 16).

Body-worn camera footage shows defendant Bell shifting positions and reaching across plaintiff when the recording began, (Def. Bell Body-worn Camera Video & Audio ("Bell BWC") (manually filed) 1:20-1:30), while defendant Haddock opened the passenger door and disengaged plaintiff's seatbelt, (Haddock BWC 4:30-4:40). Defendant Haddock then turned off plaintiff's car, placed plaintiff's keys on top of the car, and moved around to the driver's side where he seized plaintiff's arm. (Id. 4:55-5:10). Plaintiff claims that defendant Bell ended plaintiff's recording by throwing plaintiff's phone on the ground, and the video evidence does not blatantly contradict plaintiff's account. Haddock's and Bell's body worn cameras did not capture the moment plaintiff's phone left her hand. (Bell BWC 2:15-2:40; Haddock BWC 5:20-5:45). Viewed in the light most favorable to plaintiff, the timing of these events could support a finding that plaintiff's recording triggered an escalation and an eventual termination of the recording.

However, to overcome defendants' qualified immunity defense, plaintiff must also establish that the constitutional right allegedly violated was clearly established at the time. See Callahan, 555 U.S. at 236. This court must look to decisions from the United States Supreme Court, the Fourth Circuit, and the North Carolina Supreme Court to determine whether a right was clearly established. See Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). Neither the Supreme Court nor the North Carolina Supreme Court has ruled directly on the right to record police officers. The Fourth Circuit recently held that there is no clearly established right to livestream one's own traffic stop. Sharpe v. Winterville Police Dep't., 59 F.4th 674, 684 (4th Cir. 2023); cf. Szymecki v. Houck, 353 F. App'x. 852, 853 (4th Cir. 2009) (per curiam) ("First Amendment right to record police activities on public property was not clearly established in this

16

circuit . . .").

Plaintiff cites no binding authority clearly establishing a right to record police interactions. The First Amendment right plaintiff claims was violated was not clearly established at the time of the incident. Therefore, the officer defendants are entitled to qualified immunity as to plaintiff's claim of deprivation of civil rights by interference and retaliation against freedom of speech under 42 U.S.C. § 1983, and summary judgment is granted as to count three.

2.    State Law Claims

"Under North Carolina law, public officials engaged in discretionary, governmental duties enjoy absolute immunity from personal liability so long as they keep within the scope of their official authority and act without malice or corruption." Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003) (citing Grad v. Kaasa, 312 N.C. 310 (1984)). "[A] malicious act is one which is 1) done wantonly, 2) contrary to the actor's duty, and 3) intended to be injurious to another." Bartley v. City of High Point, 381 N.C. 287, 296 (2022). "[T]he analysis of public officers' immunity is functionally identical to [the court's] discussion of the [o]fficers' entitlement to qualified immunity with respect to the § 1983 claims." Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (applying North Carolina law).

Where the officer defendants are entitled to qualified immunity from plaintiff's federal claims, they are also entitled to public official immunity from plaintiff's state tort claims. Accordingly, defendants' motion for summary judgment is granted as to plaintiff's claims for false imprisonment, intentional infliction of emotional distress, assault and battery, negligent execution of official duties, and trespass under North Carolina law (counts four, five, six, seven, and eight, respectively).

### a. Negligent Hiring, Training, and Supervision

"The common law doctrine of sovereign immunity bars suits against [a] [s]tate unless it has consented or waived its immunity." Estate of Graham v. Lambert, 385 N.C. 644, 651 (2024). In North Carolina, "[c]ities, counties, and other localities are recognizable units that collectively make up the [s]tate and enjoy a slice of its sovereign power." Id. As such, a "more limited protection—termed governmental immunity—shields units of local government from suit for acts committed in their governmental capacity." Id. "To surmount a defense of governmental immunity, a plaintiff must first state a cause of action by alleging a waiver of that immunity." Id. at 652. This requires the plaintiff to "plead facts that, if taken as true, are sufficient to establish a waiver of immunity." Id.

Defendant Fayetteville acts in its governmental capacity when it hires, trains, and supervises police officers and therefore enjoys governmental immunity for those actions. Id. at 651. Defendants have presented facts demonstrating that defendant Fayetteville did not waive its governmental immunity, which plaintiff does not dispute. (See Pl.'s Resp. at 8). Accordingly, defendant Fayetteville is entitled to governmental immunity. Where there is no dispute of material facts and defendant Fayetteville is entitled to judgment as a matter of law, defendant's motion for summary judgment is granted as to count nine – negligent hiring, training, and supervision.

### CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 39) is GRANTED. The clerk is DIRECTED to update the docket as set forth at footnote one to bring it in conformity with the caption of this order. The clerk is DIRECTED to close this case.

SO ORDERED, this the 2nd day of December, 2024 .

_____
LOUISE W. FLANAGAN
United States District Judge